IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RYAN HAMMONS, | ) |
| | ) |
| NOREE KAMKONGKAEO, | ) |
| | ) |
| AARON MONEY, | ) |
| | ) |
| RHETT MONEY, | ) |
| | ) |
| ANDREW BABBITT, | ) |
| | ) |
| ASHLEY BABBITT, | ) |
| | ) |
| M.A.B., by his Father and Next Friend, ANDREW | ) |
| BABBITT, | ) |
| | ) |
| M.L.B., by his Father and Next Friend, ANDREW | ) |
| BABBITT, | ) Case No. 1:19cv2518 |
| | ) |
| O.R.B., by her Father and Next Friend, ANDREW | ) |
| BABBITT, | ) |
| | ) |
| SYLVIA BABBITT, | ) JURY TRIAL DEMANDED |
| | ) |
| LEE BABBITT III, | ) |
| | ) |
| CHRISTI BABBITT, | ) |
| | ) |
| RYAN BUYTENHUYS, | ) |
| | ) |
| CAMERON BUYTENHUYS, | ) |
| | ) |
| E.B., by his Father and Next Friend, RYAN | ) |
| BUYTENHUYS, | ) |
| | ) |
| DARROLL BUYTENHUYS, | ) |
| | ) |
| ADELE BUYTENHUYS, | ) |
| | ) |
| CLINTON BUYTENHUYS, | ) |
| | ) |
| SHELDON BUYTENHUYS, | ) |
| | ) |
| DALE SMITH, JR., | ) |

BIANCA SMITH,                                                    )
                                                                )
GABRIELLE SMITH,                                                 )
                                                                )
A.R.S., by her Father and Next Friend, DALE                     )
SMITH, JR.,                                                      )
                                                                )
I.M.S., by her Father and Next Friend, DALE                     )
SMITH, JR.,                                                      )
                                                                )
ANNIE SMITH,                                                     )
                                                                )
DALE SMITH, SR.,                                                 )
                                                                )
NICOLA RAVENSTEIN,                                              )
                                                                )
SHEENA SMITH,                                                    )
                                                                )
DEREK PLEIMAN,                                                   )
                                                                )
ERICA PLEIMAN,                                                   )
                                                                )
BRANDON JONES,                                                   )
                                                                )
ROBERT NADEAU II,                                                )
                                                                )
MIRANDA NADEAU,                                                  )
                                                                )
HALEY SCHWEICKERT,                                              )
                                                                )
TAYLOR-RAE SIMON,                                                )
                                                                )
JENNA SCHWEICKERT,                                              )
                                                                )
A.L.N., by her Father and Next Friend, ROBERT                   )
NADEAU II,                                                       )
                                                                )
ROBERT NADEAU,                                                   )
                                                                )
WILLIAM HARRIS,                                                  )
                                                                )
ANDRIA HARRIS,                                                   )
                                                                )
ALLEN COX,                                                       )
                                                                )

2

| | |
|---|---|
| DAVID EVANS, | ) |
| | ) |
| TASHIA EVANS, | ) |
| | ) |
| BRADLEY BUSBY, | ) |
| | ) |
| ROBERT HERNANDEZ, | ) |
| | ) |
| and | ) |
| | ) |
| JENNIFER HERNANDEZ, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| ISLAMIC REPUBLIC OF IRAN | ) |
| Serve:  **Foreign Minister Mohammed Zarif** | ) |
| **Ministry of Foreign Affairs** | ) |
| **Khomeini Avenue** | ) |
| **United Nations Street** | ) |
| **Tehran, Iran** | ) |
| | ) |
| Defendant. | ) |

## COMPLAINT

NOW COME the Plaintiffs, RYAN HAMMONS, NOREE KAMKONGKAEO, AARON MONEY, RHETT MONEY, ANDREW BABBITT, individually and as the natural guardian of M.A.B., M.L.B., and O.R.B., ASHLEY BABBITT, SYLVIA BABBITT, LEE BABBITT III, CHRISTI BABBITT, RYAN BUYTENHUYS, individually and as the natural guardian of E.B., CAMERON BUYTENHUYS, DARROLL BUYTENHUYS, ADELE BUYTENHUYS, CLINTON BUYTENHUYS, SHELDON BUYTENHUYS, DALE SMITH, JR., individually and as the natural guardian of A.R.S. and I.M.S., BIANCA SMITH, GABRIELLE SMITH, ANNIE SMITH, DALE SMITH, SR., NICOLA RAVENSTEIN, SHEENA SMITH, DEREK PLEIMAN, ERICA PLEIMAN, BRANDON JONES, ROBERT NADEAU II, individually and as the natural guardian of A.L.N., MIRANDA NADEAU, HALEY SCHWEICKERT, TAYLOR-RAE

SIMON, JENNA SCHWEICKERT,  ROBERT NADEAU, WILLIAM HARRIS, ANDRIA

HARRIS, ALLEN COX, DAVID EVANS, TASHIA EVANS, BRADLEY BUSBY, ROBERT

HERNANDEZ, and JENNIFER HERNANDEZ, (collectively referred to herein as "Plaintiffs"),

by counsel, and for their Complaint against Defendant, the Islamic Republic of Iran ("Iran"),

arising out of the terrorist attack in Afghanistan on January 4, 2014, state as follows:

## I.     THE PARTIES

1.       Plaintiff Ryan Hammons is a victim of the January 4, 2016 bombing.

2.       Plaintiff Noree Kamkongkaeo is the wife of Ryan Hammons.

3.       Plaintiff Aaron Money is a victim of the January 4, 2016 bombing.

4.       Plaintiff Rhett Money is the father of Aaron Money.

5.       Plaintiff Andrew Babbitt is a victim of the January 4, 2016 bombing.

6.       Plaintiff Ashley Babbitt is the wife of Andrew Babbitt.

7.       Plaintiff M.A.B. is the son of Andrew Babbitt.

8.       Plaintiff M.L.B. is the son of Andrew Babbitt.

9.       Plaintiff O.R.B. is the daughter of Andrew Babbitt.

10.      Plaintiff Sylvia Babbitt is the mother of Andrew Babbitt.

11.      Plaintiff Lee Babbitt III is the brother of Andrew Babbitt.

12.      Plaintiff Christi Babbitt is the sister of Andrew Babbitt.

13.      Plaintiff Ryan Buytenhuys is a victim of the January 4, 2016 bombing.

14.      Plaintiff Cameron Buytenhuys is the son of Ryan Buytenhuys.

15.      Plaintiff E.B. is the son of Ryan Buytenhuys.

16.      Plaintiff Darroll Buytenhuys is the father of Ryan Buytenhuys.

17.      Plaintiff Adele Buytenhuys is the mother of Ryan Buytenhuys.

18.     Plaintiff Clinton Buytenhuys is the brother of Ryan Buytenhuys.

19.     Plaintiff Sheldon Buytenhuys is the brother of Ryan Buytenhuys.

20.     Plaintiff Dale Smith, Jr. is a victim of the January 4, 2016 bombing.

21.     Plaintiff Bianca Smith is the wife of Dale Smith, Jr.

22.     Plaintiff Gabrielle Smith is the daughter of Dale Smith, Jr.

23.     Plaintiff A.R.S. is the daughter of Dale Smith, Jr.

24.     Plaintiff I.M.S. is the daughter of Dale Smith, Jr.

25.     Plaintiff Annie Smith is the mother of Dale Smith, Jr.

26.     Plaintiff Dale Smith, Sr. is the father of Dale Smith, Jr.

27.     Plaintiff Nicola Ravenstein is the sister of Dale Smith, Jr.

28.     Plaintiff Sheena Smith is the sister of Dale Smith, Jr.

29.     Plaintiff Derek Pleiman is a victim of the January 4, 2016 bombing.

30.     Plaintiff Erica Pleiman is the wife of Derek Pleiman.

31.     Plaintiff Brandon Jones is a victim of the January 4, 2016 bombing.

32.     Plaintiff Robert Nadeau II is a victim of the January 4, 2016 bombing.

33.     Plaintiff Miranda Nadeau is the wife of Robert Nadeau II.

34.     Plaintiff Haley Schweickert is the daughter of Robert Nadeau II.

35.     Plaintiff Taylor-Rae Simon is the daughter of Robert Nadeau II.

36.     Plaintiff Jenna Schweickert is the daughter of Robert Nadeau II.

37.     Plaintiff A.L.N. is the daughter of Robert Nadeau II.

38.     Plaintiff Robert Nadeau is the father of Robert Nadeau II.

39.     Plaintiff William Harris is a victim of the January 4, 2016 bombing.

40.     Plaintiff Andria Harris is the wife of William Harris.

41. Plaintiff Allen Cox is a victim of the January 4, 2016 bombing.

42. Plaintiff David Evans is a victim of the January 4, 2016 bombing.

43. Plaintiff Tashia Evans is the wife of David Evans.

44. Plaintiff Bradley Busby is a victim of the January 4, 2016 bombing.

45. Plaintiff Robert Hernandez is a victim of the January 4, 2016 bombing.

46. Plaintiff Jennifer Hernandez is the wife of Robert Hernandez.

47. Defendant, Iran, is a foreign state. Since January 19, 1984, Iran has been designated as a state sponsor of international terrorism pursuant to Section 6(j) of the Export Administration Act of 1979, 50 U.S.C. § 2405(j), and the Foreign Assistance Act of 1961, 22 U.S.C. § 2371(b).

## II.   JURISDICTION AND VENUE

48. Jurisdiction over the subject matter of this case arises under 28 U.S.C. §§ 1330(a), 1331, 1332(a)(2), 1367, and 1605A.

49. Despite its status as a foreign state, Defendant is subject to suit in the courts of the United States pursuant to the Foreign Sovereign Immunities Act, as amended, specifically 28 U.S.C. § 1605A, due to Iran's longstanding designation as a "State Sponsor of Terrorism."

50. Venue is proper in this district pursuant to 28 U.S.C. § 1391(f)(4).

51. At the time of the January 4, 2016 bombings, Plaintiffs were all citizens of the United States of America and have remained so to the present day.

## III.   NATURE OF THE ACTION

52. On January 4, 2016, at 6:34pm local time, a truck containing over three thousand pounds of explosives was detonated outside of Camp Sullivan, a property located near the Kabul International Airport and used to house United States embassy personnel (the "Camp Sullivan

Attack"). The explosion wounded more than thirty people, including Plaintiffs Ryan Hammons, Aaron Money, Andrew Babbitt, Ryan Buytenhuys, Dale Smith, Jr., Derek Pleiman, Brandon Jones, Robert Nadeau II, William Harris, Allen Cox, David Evans, Bradley Busby, and Robert Hernandez (collectively, the "Camp Sullivan Victims").

53.     The Taliban claimed responsibility for the attack.

54.     The terrorist bombing was part of a broader conspiracy between the Taliban and Iran to attack American interests in Afghanistan with violent acts of terrorism.

55.     Iran has long served as a co-conspirator with the Taliban. It leverages that relationship to advance its goal of expanding its influence in Afghanistan by fostering political instability and pressuring American leaders to withdraw military forces.

56.     To carry out the Camp Sullivan Attack, Taliban operatives needed financial support, training in the use of explosives and tactics, freedom to travel across the border with Iran, and explosive materials. Iran has consistently provided the Taliban with each of these types of support since at least 2007.

57.     By knowingly and intentionally providing material support and resources to enable and assist the Taliban in carrying out acts of terrorism, Iran is liable for the damages suffered by Plaintiffs as a direct and proximate result of the Camp Sullivan Attack.

IV.     **FACTUAL ALLEGATIONS**

A.     **Iran's Substantial and Pervasive Support for International Terrorism**

58.     Since the Iranian revolution in 1979, Iran has engaged in and supported terrorist organizations and acts of terrorism as an instrument of its foreign policy.

59.     Iran's widespread support for terrorist groups such as Hezbollah, Hamas, and the Taliban is well-documented. As a result, the State Department has formally designated Iran as a state sponsor of terrorism at all times since its initial designation in 1984.

60.     Iran carries out its support of terrorism, in large part, through the Islamic Revolutionary Guard Corps ("IRGC"), which is a military force parallel to the regular Iranian military. The IRGC is supervised by the Iranian Parliament but operates as an agent and instrumentality of the Supreme Leader of Iran, Ayatollah Ali Hoseini Khamenei. The Supreme Leader serves as commander and chief of the armed forces, appoints the head of each military service, declares war and peace, appoints the head of the judiciary, and may dismiss the elected president of Iran at any time.

61.     The IRGC also has a constitutional role as the defender of the Islamic Revolution and owns or controls hundreds of companies, particularly those in the oil and gas, engineering, telecommunications, and infrastructure sectors, and holds billions of dollars in military business and other government contracts.

62.     On April 15, 2019, the IRGC was formally designated by the State Department as a Foreign Terrorist Organization.

63.     The IRGC has a special foreign division, known as the Quds Force ("IRGC-QF"), which is the branch of the IRGC primarily used to promote and support terrorism abroad. The IRGC-QF has a long and well-documented history of assassinations, kidnappings, bombings, and arms dealing, and is one of the most organized, disciplined, and deadly organizations in the world.

64.     The IRGC-QF provides funding and training for terrorism operations targeting American citizens, including support for terrorist organizations like Hezbollah, al Qaeda, and the

Taliban. These activities are known and sanctioned by Iran's Supreme Leader and are an official platform of Iran's foreign policy.

65.     Accordingly, pursuant to Executive Order 13224, the Treasury Department has designated the IRGC-QF as a "terrorist organization" and the State Department has designated the IRGC-QF as a "foreign terrorist organization."

66.     Iran also supports terrorism through its Ministry of Information and Security ("MOIS"), which is an intelligence agency with an annual budget of between $100 million and $400 million. Like the IRGC-QF, MOIS has been involved in kidnappings, assassinations, and other acts of terrorism since its inception.

**B.     The Development of the Iran-Taliban Relationship**

67.     Although the Iranian regime is Shia and the Taliban is a Sunni organization, those religious differences do not and have not kept them from conspiring together in terrorist activities.

68.     Iran first provided limited support to Sunni Afghan groups during the Soviet-Afghan War, where its primary goal was to resist the expansion of communist and Western influence in the region. Its support to these groups in the fight against Russian forces was often conditioned on the adoption of anti-American positions and Iran condemned any reliance on Western-supplied weapons during the conflict.

69.     During this time, Ayatollah Khomeini, Iran's Supreme Leader until his death in 1989, publicly stated that Iran should welcome all Afghans, including Sunnis, particularly because of their common enemies.

70.     Historically, however, the relationship between Iran and the Taliban was a contentious and violent one. Following the withdrawal of Soviet troops in 1989, Afghanistan was

engulfed in civil war for much of the 1990s. On one side of that conflict were Shia militias, whom Iran actively supported with the hope of establishing a friendly Shia government on its eastern border. This effort was ultimately unsuccessful, however, as by 1996 the Taliban had secured control over most of Afghanistan and largely eradicated the Shia forces.

71.     Tensions between Iran and the Taliban peaked in August 1998 when Taliban forces captured the city of Mazar-I Sharif in northwestern Afghanistan. After capturing the city, the Taliban targeted ethnic Shia individuals for execution. Among those killed were eight Iranian consulate officials and an Iranian journalist, whom the Taliban later claimed had been operating as intelligence officers.

72.     This tense dynamic between Iran and the Taliban dramatically shifted after September 11, 2001 and the subsequent American-led invasion of Afghanistan. For the first time since the Soviet-Afghan War, the two sides had common ground in opposing the rapid growth of foreign influence in the region.

73.     In fact, groundwork for this shift had begun forming prior to the 9/11 attacks. In January 2001, a Taliban delegation met with senior Iranian officials to discuss various military and political matters. One such topic was "Iran's purported desire to see the Taliban join the Northern Alliance in order to defend Afghanistan" in the event of an American invasion. *See Khairkhwa v. Obama*, 793 F. Supp. 2d 1, 36 (D.D.C. 2011).

74.     As soon as October 2001, members of the IRGC were already meeting with the Taliban to offer them military support and resources. Iran instigated this meeting and it was held on the Iranian side of the border with Afghanistan. *Id.* at 37. This gathering officially ushered in a new era of cooperation between Iran and the Taliban.

75.     As part of this initial offer of support, Iran pledged to sell advanced military equipment to the Taliban for use against Americans, bragged of their ability to track US military forces, and promised "to open their border to Arabs entering Afghanistan." Iran also "offered to broker a peace between the Taliban and the Northern Alliance so Muslims could unite against the United States." *Id.* at 38.

76.     Shortly before Coalition air strikes began in 2001, Iran sent a high-ranking official to offer sanctuary to Taliban leaders. Those who travelled to Iran were allowed to move freely across the Iran-Afghanistan border to recruit fighters and inflict damage on Afghan and Coalition interests. The IRGC offered these same Taliban forces cash rewards for the killing of Afghan officials or American soldiers.

77.     In February 2002, then Director of Central Intelligence, George J. Tenet, testified before Congress that "initial signs of Tehran's cooperation and common cause with us in Afghanistan are being eclipsed by Iranian efforts to undermine US influence there. While Iran's officials express a shared interest in a stable government in Afghanistan, its security forces appear bent on countering the US presence."

78.     In March 2007, a shipment of Iranian-made weapons bound for the Taliban was captured by American forces inside Afghanistan. This shipment included mortars and plastic explosives bearing markings indicating that they were manufactured in Iran.

79.     In January 2009, the official spokesman for the Pentagon stated that the United States had observed Iranian support, such as the provision of explosively formed penetrators, in Afghanistan.

80.     On August 30, 2009, U.S. Army General Stanley McChrystal, the commander of American forces in Afghanistan, referred to Iran's role in Afghanistan at that time as

"ambiguous." While Iran publicly appeared to support the development of the new government in Kabul, the IRGC-QF was training Taliban fighters "and providing other forms of military assistance to insurgents." He noted that "Iran has the capability to threaten the mission in the future."

81.     In December 2009, intelligence officials from the United Arab Emirates reported to the Treasury Department that Iran was supporting the Taliban financially, providing them weapons, helping the Taliban to smuggle narcotics, and facilitating the movement of Taliban members. It was specifically noted that the IRGC and the Iranian Navy were involved in the provision of these various forms of material support to the Taliban.

82.     In March 2010, a Taliban commander was quoted as saying of Iran, "our religions and our histories are different, but our target is the same – we both want to kill Americans."

83.     In May 2010, Gen. McChrystal stated publicly that Iran was providing material support to the Taliban. He explained "[t]he training that we have seen occurs inside Iran with fighters moving inside Iran" and that there is "clear evidence of Iranian activity, in some cases of providing weapons and training to the Taliban that is inappropriate."

84.     On August 3, 2010, the United States Department of the Treasury designated General Hossein Musavi and Colonel Hasan Mortezavi for their roles in supporting the Taliban. General Musavi was the leader of the Ansar Corps, the branch of the IRGC-QF responsible for carrying out activities within Afghanistan. Colonel Mortezavi is a senior officer in the IRGC-QF. The Treasury Department found that both General Musavi and Colonel Mortezavi, acting in their official roles, had provided "financial and material support to the Taliban." In that same report, the Treasury Department concluded that "the IRGC-QF provides select members of the Taliban with weapons, funding, logistics and training."

85.     On February 5, 2011, British troops intercepted a weapons shipment of rockets to the Taliban. British foreign secretary William Hague stated about the shipment that "detailed technical analysis, together with the circumstances of the seizure, leave us in no doubt that the weaponry recovered came from Iran."

86.     On March 7, 2012, the Treasury Department designated IRGC-QF General Gholamreza Baghbani as a Specially Designated Narcotics Trafficker. General Baghbani, acting in his official role as a senior IRGC-QF officer, facilitated a drug smuggling ring that involved the shipment of opium from Afghanistan into Iran in exchange for weapons. The drug smugglers working on behalf of General Baghbani would deliver weapons directly to the Taliban.

87.     In April 2012, the Department of Defense provided Congress with its Annual Report on Military Power of Iran and stated that the "active sponsorship of terrorist and insurgent groups, such as Lebanese Hizballah, Iraqi Shia groups, and the Taliban, are tools Iran uses to increase its regional power." The Report further explained that even though Iranian "support to the Taliban is inconsistent with their historic enmity, it complements Iran's strategy of backing many groups to maximize its influence while also undermining U.S. and [NATO] objectives by fomenting violence." By means of "the IRGC-QF, Iran provides material support to terrorist or militant groups such as . . . the Taliban."

88.     The United States Department of State concluded that, in 2012, "the IRGC-QF trained Taliban elements on small unit tactics, small arms, explosives, and indirect fire weapons, such as mortars, artillery, and rockets." The State Department further stated that arms transfers to the Taliban from Iran, including plastic explosives, had been going on since 2006.

89.     By July 2012, Iran had allowed the Taliban to open an office in Zahedan, Iran.

90.     On February 6, 2014, the Treasury Department designated two more IRGC-QF officers, Alireza Hemmati and Akbar Seyed Alhosseini, for their role in "supporting terrorism in Afghanistan and funneling Iranian assistance to the Taliban." This support included the provision of "logistical assistance" to an associate responsible for planning and executing terrorist attacks.

91.     Early in 2014, Iran allowed the Taliban to open an office in Mashhad, Iran.

92.     On May 27, 2014, President Obama announced that American combat operations in Afghanistan would end by December 2014 and that troop levels would be significantly reduced by that time. In anticipation of this troop withdrawal, Iran greatly accelerated its support for the Taliban in 2014 and 2015.

93.     In June 2015, approximately six months before the Camp Sullivan Attack, a Taliban commander stated that "Iran supplies us with whatever we need." This same commander explained how he had been detained in Iran as an illegal laborer but was offered double his prior salary by the IRGC if he "went to work for them in Afghanistan." At that time, the IRGC was operating at least four Taliban training camps within Iran and was increasing its transportation of weapons and explosives into Afghanistan.

94.     The emergence of a wing of the Islamic State ("ISIS") in Afghanistan in 2015 deepened Iran's desire to support the Taliban as a partner in the Iranian regime's ongoing battle against ISIS.

95.     On May 21, 2016, then Taliban leader Mullah Akhtar Mohammed Mansour was killed by a drone strike at the Iran-Pakistan border. The Taliban's chief spokesman, Zabihullah Mujahid, subsequently stated that Mullah Mansour had been visiting Iran to fulfill "ongoing battle obligations."

96.     Later in 2016, three IRGC-QF officers were killed in an American air strike against Taliban positions in the Farah province of Afghanistan.

97.     Beyond direct military training and supplies, Iran has long served as a financial lifeline for the Taliban through its involvement in and enabling of the Taliban's illegal drug trafficking. Narcotics are the Taliban's greatest source of income. Iran assists in this financing by allowing its border with Afghanistan to be crossed by the Taliban and enlisting members of the IRGC in the transport and sale of large quantities of illicit drugs.

98.     Iran's support for the Taliban is ongoing and accelerating. In September 2017, Department of Defense officials reported that Iran had recently increased its support of anti-American forces in Afghanistan, specifically including the Taliban.

99.     On October 23, 2018, the Treasury Department announced the designation of eight individuals as a result of an international effort to curb Iran's illicit support for the Taliban. Among these individuals were:

- Mohammad Ebrahim Owhadi, as an IRGC-QF officer that reached an agreement in 2017 with a Taliban governor to ensure Iranian support for the Taliban in the Herat Province of Afghanistan. He was also involved in 2016 planning for a compound in Iran that would be used to house Taliban fighters and their families. In 2014, Owhadi was personally involved with distributing arms to Afghanistan on behalf of the IRGC-QF.

- Esma'il Razavi, who acted "for or on behalf of IRGC-QF and for assisting in, sponsoring, or providing financial, material, or technological support for, or financial or other services to or in support of, the Taliban." He was found to have personally encouraged and ordered the Taliban to carry out terrorist acts.

- Abdullah Samad Faroqui, the Taliban governor who conspired with Owhadi to further the training and support relationship between the Taliban and Iran. In early 2018, he personally received thousands of kilograms of explosives from the IRGC for distribution to Taliban commanders. He met with Iranian intelligence officials as early as 2006 to facilitate the supply of money and military equipment to the Taliban.

100.    In November 2018, the United States Government announced its recovery of an Iranian-made drone in Afghanistan that had been launched from Iran and used to surveil Afghan and American military installations. At the same time, the United States also revealed Iranian-made rockets that were recovered directly from Taliban forces.

101.    Taliban fighters continue to receive advanced military and tactical training from Iran in large numbers. Much of the training takes place inside of Iran, facilitated by the freedom of movement that Iran allows for Taliban fighters across its border. In exchange for this support, Iran demands that the Taliban to focus on particular targets, specifically including American personnel.

### C.    The Camp Sullivan Attack

102.    Camp Sullivan is located close to the Kabul International Airport. In January 2016 it was regularly used for housing embassy personnel and private civilian contractors. Adjacent to Camp Sullivan was a residential complex known as Darya Village that was used for the same purpose.

103.    The Camp Sullivan Victims were employed as private contractors for the United States Government in Afghanistan, primarily for the purpose of providing security services to other American personnel. As of January 4, 2016, they each resided in various buildings within Camp Sullivan and Darya Village.

104.    Around 6pm on evening on January 4, 2016, many of the Camp Sullivan Victims were eating dinner in the chow hall of Darya Village, while others were located at various points throughout the two compounds.

105.    The chow hall was approximately 100 yards from the perimeter of the compound. An 18-foot concrete barrier stood between the perimeter and the chow hall. Also protecting the

Darya Village compound was a Hesco bastion, a temporary barrier commonly used for military defense to lessen the impact of explosions.

106.    Earlier that same evening, a truck containing more than three thousand pounds of explosive material was parked on the small road running between the Camp Sullivan and Darya Village compounds. At 6:34pm, the explosive material was detonated, causing a massive explosion.

107.    The 18-foot concrete barrier and the Hesco bastion separating Darya Village from the road were completely destroyed in the blast. The wall of the chow hall closest to the roadway collapsed. The concussive force from the explosion caused all the tables and people inside the chow hall to be thrown to the opposite side of the room. Glass shrapnel and other debris filled the chow hall and the surrounding areas.

108.    On the other side of the road, equivalent damage was done to the concrete barrier protecting Camp Sullivan from the roadway and to many of the structures within Camp Sullivan.

109.    The crater left in the roadway was estimated to be as much as sixty feet wide and more than twenty feet deep.

110.    The Camp Sullivan Victims were injured in the blast, both from the concussive force of the explosion and by the flying debris and shrapnel.

111.    Official Taliban spokesman Zabihullah Mujahid claimed responsibility for the Camp Sullivan Attack on Twitter on behalf of the Taliban that same day.

## V.    CAUSES OF ACTION

### COUNT I – PROVISION OF MATERIAL SUPPORT FOR THE ATTEMPTED EXTRAJUDICIAL KILLING OF RYAN HAMMONS (28 U.S.C. § 1605A(c))

112.    Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

113.    At the time of the events at issue, Iran was designated as a state sponsor of terrorism and remains so designated today.

114.    Iran provided material support and resources to the Taliban for the purpose of supporting, enabling, advancing, and benefitting from the terrorist activities of the Taliban, including through the fomenting of general unrest in Afghanistan and the commission of attacks against United States personnel and interests.

115.    As such, Iran's provision of material support and resources to the Taliban was and is intentional, wanton, and willful, with the explicit understanding that violence against Americans, such as Ryan Hammons, is an expected and welcomed result of those actions.

116.    Such conduct violates 28 U.S.C. § 1605A.

117.    A private right of action is established under 28 U.S.C. § 1605A(c) for violations of that section leading to injuries that "may include economic damages, solatium, pain and suffering, and punitive damages."

118.    The Camp Sullivan Attack was an unauthorized, illegal, and deliberate use of physical force resulting in substantial human casualties, executed with the attempt to bring about injuries and/or death to United States citizens.

119.    As a direct and proximate result of Iran's willful, wrongful, and intentional acts, Ryan Hammons was injured in the Camp Sullivan Attack.

120.    As a direct and proximate result of Iran's actions, Noree Kamkongkaeo has experienced significant solatium damages including, but not limited to, severe mental anguish and harm caused by the loss of Ryan Hammons's society and comfort.

121.    Iran's continuing provision of material support to those willing to commit murder, and other terrorist acts, such as the Taliban, is criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages.

### COUNT II – PROVISION OF MATERIAL SUPPORT FOR THE ATTEMPTED EXTRAJUDICIAL KILLING OF AARON MONEY (28 U.S.C. § 1605A(c))

122.    Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

123.    At the time of the events at issue, Iran was designated as a state sponsor of terrorism and remains so designated today.

124.    Iran provided material support and resources to the Taliban for the purpose of supporting, enabling, advancing, and benefitting from the terrorist activities of the Taliban, including through the fomenting of general unrest in Afghanistan and the commission of attacks against United States personnel and interests.

125.    As such, Iran's provision of material support and resources to the Taliban was and is intentional, wanton, and willful, with the explicit understanding that violence against Americans, such as Aaron Money, is an expected and welcomed result of those actions.

126.    Such conduct violates 28 U.S.C. § 1605A.

127.    A private right of action is established under 28 U.S.C. § 1605A(c) for violations of that section leading to injuries that "may include economic damages, solatium, pain and suffering, and punitive damages."

128.    The Camp Sullivan Attack was an unauthorized, illegal, and deliberate use of physical force resulting in substantial human casualties, executed with the attempt to bring about injuries and/or death to United States citizens.

129.    As a direct and proximate result of Iran's willful, wrongful, and intentional acts, Aaron Money was injured in the Camp Sullivan Attack.

130.    As a direct and proximate result of Iran's actions, Rhett Money has experienced significant solatium damages including, but not limited to, severe mental anguish and harm caused by the loss of Aaron Money's society and comfort.

131.    Iran's continuing provision of material support to those willing to commit murder, and other terrorist acts, such as the Taliban, is criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages.

### COUNT III – PROVISION OF MATERIAL SUPPORT FOR THE ATTEMPTED EXTRAJUDICIAL KILLING OF ANDREW BABBITT (28 U.S.C. § 1605A(c))

132.    Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

133.    At the time of the events at issue, Iran was designated as a state sponsor of terrorism and remains so designated today.

134.    Iran provided material support and resources to the Taliban for the purpose of supporting, enabling, advancing, and benefitting from the terrorist activities of the Taliban, including through the fomenting of general unrest in Afghanistan and the commission of attacks against United States personnel and interests.

135.    As such, Iran's provision of material support and resources to the Taliban was and is intentional, wanton, and willful, with the explicit understanding that violence against Americans, such as Andrew Babbitt, is an expected and welcomed result of those actions.

136.    Such conduct violates 28 U.S.C. § 1605A.

137.    A private right of action is established under 28 U.S.C. § 1605A(c) for violations of that section leading to injuries that "may include economic damages, solatium, pain and suffering, and punitive damages."

138.    The Camp Sullivan Attack was an unauthorized, illegal, and deliberate use of physical force resulting in substantial human casualties, executed with the attempt to bring about injuries and/or death to United States citizens.

139.    As a direct and proximate result of Iran's willful, wrongful, and intentional acts, Andrew Babbitt was injured in the Camp Sullivan Attack.

140.    As a direct and proximate result of Iran's actions, Ashley Babbitt, M.A.B., M.L.B., O.R.B, Sylvia Babbitt, Lee Babbitt III, and Christi Babbitt have experienced significant solatium damages including, but not limited to, severe mental anguish and harm caused by the loss of Andrew Babbitt's society and comfort.

141.    Iran's continuing provision of material support to those willing to commit murder, and other terrorist acts, such as the Taliban, is criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages.

## COUNT IV – PROVISION OF MATERIAL SUPPORT FOR THE ATTEMPTED EXTRAJUDICIAL KILLING OF RYAN BUYTENHUYS (28 U.S.C. § 1605A(c))

142.    Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

143.    At the time of the events at issue, Iran was designated as a state sponsor of terrorism and remains so designated today.

144.    Iran provided material support and resources to the Taliban for the purpose of supporting, enabling, advancing, and benefitting from the terrorist activities of the Taliban,

including through the fomenting of general unrest in Afghanistan and the commission of attacks against United States personnel and interests.

145.    As such, Iran's provision of material support and resources to the Taliban was and is intentional, wanton, and willful, with the explicit understanding that violence against Americans, such as Ryan Buytenhuys, is an expected and welcomed result of those actions.

146.    Such conduct violates 28 U.S.C. § 1605A.

147.    A private right of action is established under 28 U.S.C. § 1605A(c) for violations of that section leading to injuries that "may include economic damages, solatium, pain and suffering, and punitive damages."

148.    The Camp Sullivan Attack was an unauthorized, illegal, and deliberate use of physical force resulting in substantial human casualties, executed with the attempt to bring about injuries and/or death to United States citizens.

149.     As a direct and proximate result of Iran's willful, wrongful, and intentional acts, Ryan Buytenhuys was injured in the Camp Sullivan Attack.

150.    As a direct and proximate result of Iran's actions, Cameron Buytenhuys, E.B., Darroll Buytenhuys, Adele Buytenhuys, Clinton Buytenhuys, and Sheldon Buytenhuys have experienced significant solatium damages including, but not limited to, severe mental anguish and harm caused by the loss of Ryan Buytenhuys' society and comfort.

151.    Iran's continuing provision of material support to those willing to commit murder, and other terrorist acts, such as the Taliban, is criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages.

## COUNT V – PROVISION OF MATERIAL SUPPORT FOR THE ATTEMPTED EXTRAJUDICIAL KILLING OF DALE SMITH, JR. (28 U.S.C. § 1605A(c))

152.    Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

153.    At the time of the events at issue, Iran was designated as a state sponsor of terrorism and remains so designated today.

154.    Iran provided material support and resources to the Taliban for the purpose of supporting, enabling, advancing, and benefitting from the terrorist activities of the Taliban, including through the fomenting of general unrest in Afghanistan and the commission of attacks against United States personnel and interests.

155.    As such, Iran's provision of material support and resources to the Taliban was and is intentional, wanton, and willful, with the explicit understanding that violence against Americans, such as Dale Smith, Jr., is an expected and welcomed result of those actions.

156.    Such conduct violates 28 U.S.C. § 1605A.

157.    A private right of action is established under 28 U.S.C. § 1605A(c) for violations of that section leading to injuries that "may include economic damages, solatium, pain and suffering, and punitive damages."

158.    The Camp Sullivan Attack was an unauthorized, illegal, and deliberate use of physical force resulting in substantial human casualties, executed with the attempt to bring about injuries and/or death to United States citizens.

159.    As a direct and proximate result of Iran's willful, wrongful, and intentional acts, Dale Smith, Jr. was injured in the Camp Sullivan Attack.

160.    As a direct and proximate result of Iran's actions, Bianca Smith, Gabrielle Smith, A.R.S., I.M.S., Annie Smith, Dale Smith, Sr., Nicola Ravenstein, and Sheena Smith have

experienced significant solatium damages including, but not limited to, severe mental anguish and harm caused by the loss of Dale Smith, Jr.'s society and comfort.

161.    Iran's continuing provision of material support to those willing to commit murder, and other terrorist acts, such as the Taliban, is criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages.

## COUNT VI – PROVISION OF MATERIAL SUPPORT FOR THE ATTEMPTED EXTRAJUDICIAL KILLING OF DEREK PLEIMAN (28 U.S.C. § 1605A(c))

162.    Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

163.    At the time of the events at issue, Iran was designated as a state sponsor of terrorism and remains so designated today.

164.    Iran provided material support and resources to the Taliban for the purpose of supporting, enabling, advancing, and benefitting from the terrorist activities of the Taliban, including through the fomenting of general unrest in Afghanistan and the commission of attacks against United States personnel and interests.

165.    As such, Iran's provision of material support and resources to the Taliban was and is intentional, wanton, and willful, with the explicit understanding that violence against Americans, such as Derek Pleiman, is an expected and welcomed result of those actions.

166.    Such conduct violates 28 U.S.C. § 1605A.

167.    A private right of action is established under 28 U.S.C. § 1605A(c) for violations of that section leading to injuries that "may include economic damages, solatium, pain and suffering, and punitive damages."

168.    The Camp Sullivan Attack was an unauthorized, illegal, and deliberate use of physical force resulting in substantial human casualties, executed with the attempt to bring about injuries and/or death to United States citizens.

169.    As a direct and proximate result of Iran's willful, wrongful, and intentional acts, Derek Pleiman was injured in the Camp Sullivan Attack.

170.    As a direct and proximate result of Iran's actions, Erica Pleiman has experienced significant solatium damages including, but not limited to, severe mental anguish and harm caused by the loss of Derek Pleiman's society and comfort.

171.    Iran's continuing provision of material support to those willing to commit murder, and other terrorist acts, such as the Taliban, is criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages.

### COUNT VII – PROVISION OF MATERIAL SUPPORT FOR THE ATTEMPTED EXTRAJUDICIAL KILLING OF BRANDON JONES (28 U.S.C. § 1605A(c))

172.    Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

173.    At the time of the events at issue, Iran was designated as a state sponsor of terrorism and remains so designated today.

174.    Iran provided material support and resources to the Taliban for the purpose of supporting, enabling, advancing, and benefitting from the terrorist activities of the Taliban, including through the fomenting of general unrest in Afghanistan and the commission of attacks against United States personnel and interests.

175.    As such, Iran's provision of material support and resources to the Taliban was and is intentional, wanton, and willful, with the explicit understanding that violence against Americans, such as Brandon Jones, is an expected and welcomed result of those actions.

176.   Such conduct violates 28 U.S.C. § 1605A.

177.   A private right of action is established under 28 U.S.C. § 1605A(c) for violations of that section leading to injuries that "may include economic damages, solatium, pain and suffering, and punitive damages."

178.   The Camp Sullivan Attack was an unauthorized, illegal, and deliberate use of physical force resulting in substantial human casualties, executed with the attempt to bring about injuries and/or death to United States citizens.

179.   As a direct and proximate result of Iran's willful, wrongful, and intentional acts, Brandon Jones was injured in the Camp Sullivan Attack.

180.   Iran's continuing provision of material support to those willing to commit murder, and other terrorist acts, such as the Taliban, is criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages.

## COUNT VIII – PROVISION OF MATERIAL SUPPORT FOR THE ATTEMPTED EXTRAJUDICIAL KILLING OF ROBERT NADEAU II (28 U.S.C. § 1605A(c))

181.   Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

182.   At the time of the events at issue, Iran was designated as a state sponsor of terrorism and remains so designated today.

183.   Iran provided material support and resources to the Taliban for the purpose of supporting, enabling, advancing, and benefitting from the terrorist activities of the Taliban, including through the fomenting of general unrest in Afghanistan and the commission of attacks against United States personnel and interests.

184.   As such, Iran's provision of material support and resources to the Taliban was and is intentional, wanton, and willful, with the explicit understanding that violence against Americans, such as Robert Nadeau II, is an expected and welcomed result of those actions.

185.   Such conduct violates 28 U.S.C. § 1605A.

186.   A private right of action is established under 28 U.S.C. § 1605A(c) for violations of that section leading to injuries that "may include economic damages, solatium, pain and suffering, and punitive damages."

187.   The Camp Sullivan Attack was an unauthorized, illegal, and deliberate use of physical force resulting in substantial human casualties, executed with the attempt to bring about injuries and/or death to United States citizens.

188.    As a direct and proximate result of Iran's willful, wrongful, and intentional acts, Robert Nadeau II was injured in the Camp Sullivan Attack.

189.   As a direct and proximate result of Iran's actions, Miranda Nadeau, A.L.N., Haley Schweickert, Taylor-Rae Simon, Jenna Schweickert, and Robert Nadeau have experienced significant solatium damages including, but not limited to, severe mental anguish and harm caused by the loss of Robert Nadeau II's society and comfort.

190.   Iran's continuing provision of material support to those willing to commit murder, and other terrorist acts, such as the Taliban, is criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages.

### COUNT IX – PROVISION OF MATERIAL SUPPORT FOR THE ATTEMPTED EXTRAJUDICIAL KILLING OF WILLIAM HARRIS (28 U.S.C. § 1605A(c))

191.   Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

192.    At the time of the events at issue, Iran was designated as a state sponsor of terrorism and remains so designated today.

193.    Iran provided material support and resources to the Taliban for the purpose of supporting, enabling, advancing, and benefitting from the terrorist activities of the Taliban, including through the fomenting of general unrest in Afghanistan and the commission of attacks against United States personnel and interests.

194.    As such, Iran's provision of material support and resources to the Taliban was and is intentional, wanton, and willful, with the explicit understanding that violence against Americans, such as William Harris, is an expected and welcomed result of those actions.

195.    Such conduct violates 28 U.S.C. § 1605A.

196.    A private right of action is established under 28 U.S.C. § 1605A(c) for violations of that section leading to injuries that "may include economic damages, solatium, pain and suffering, and punitive damages."

197.    The Camp Sullivan Attack was an unauthorized, illegal, and deliberate use of physical force resulting in substantial human casualties, executed with the attempt to bring about injuries and/or death to United States citizens.

198.     As a direct and proximate result of Iran's willful, wrongful, and intentional acts, William Harris was injured in the Camp Sullivan Attack.

199.    As a direct and proximate result of Iran's actions, Andria Harris has experienced significant solatium damages including, but not limited to, severe mental anguish and harm caused by the loss of William Harris' society and comfort.

200.    Iran's continuing provision of material support to those willing to commit murder, and other terrorist acts, such as the Taliban, is criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages.

### COUNT X – PROVISION OF MATERIAL SUPPORT FOR THE ATTEMPTED EXTRAJUDICIAL KILLING OF ALLEN COX (28 U.S.C. § 1605A(c))

201.    Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

202.    At the time of the events at issue, Iran was designated as a state sponsor of terrorism and remains so designated today.

203.    Iran provided material support and resources to the Taliban for the purpose of supporting, enabling, advancing, and benefitting from the terrorist activities of the Taliban, including through the fomenting of general unrest in Afghanistan and the commission of attacks against United States personnel and interests.

204.    As such, Iran's provision of material support and resources to the Taliban was and is intentional, wanton, and willful, with the explicit understanding that violence against Americans, such as Allen Cox, is an expected and welcomed result of those actions.

205.    Such conduct violates 28 U.S.C. § 1605A.

206.    A private right of action is established under 28 U.S.C. § 1605A(c) for violations of that section leading to injuries that "may include economic damages, solatium, pain and suffering, and punitive damages."

207.    The Camp Sullivan Attack was an unauthorized, illegal, and deliberate use of physical force resulting in substantial human casualties, executed with the attempt to bring about injuries and/or death to United States citizens.

208.    As a direct and proximate result of Iran's willful, wrongful, and intentional acts, Allen Cox was injured in the Camp Sullivan Attack.

209.    Iran's continuing provision of material support to those willing to commit murder, and other terrorist acts, such as the Taliban, is criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages.

## COUNT XI – PROVISION OF MATERIAL SUPPORT FOR THE ATTEMPTED EXTRAJUDICIAL KILLING OF DAVID EVANS (28 U.S.C. § 1605A(c))

210.    Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

211.    At the time of the events at issue, Iran was designated as a state sponsor of terrorism and remains so designated today.

212.    Iran provided material support and resources to the Taliban for the purpose of supporting, enabling, advancing, and benefitting from the terrorist activities of the Taliban, including through the fomenting of general unrest in Afghanistan and the commission of attacks against United States personnel and interests.

213.    As such, Iran's provision of material support and resources to the Taliban was and is intentional, wanton, and willful, with the explicit understanding that violence against Americans, such as David Evans, is an expected and welcomed result of those actions.

214.    Such conduct violates 28 U.S.C. § 1605A.

215.    A private right of action is established under 28 U.S.C. § 1605A(c) for violations of that section leading to injuries that "may include economic damages, solatium, pain and suffering, and punitive damages."

216.     The Camp Sullivan Attack was an unauthorized, illegal, and deliberate use of physical force resulting in substantial human casualties, executed with the attempt to bring about injuries and/or death to United States citizens.

217.      As a direct and proximate result of Iran's willful, wrongful, and intentional acts, David Evans was injured in the Camp Sullivan Attack.

218.     As a direct and proximate result of Iran's actions, Tashia Evans has experienced significant solatium damages including, but not limited to, severe mental anguish and harm caused by the loss of David Evans' society and comfort.

219.     Iran's continuing provision of material support to those willing to commit murder, and other terrorist acts, such as the Taliban, is criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages.

**COUNT XII – PROVISION OF MATERIAL SUPPORT FOR THE ATTEMPTED EXTRAJUDICIAL KILLING OF BRADLEY BUSBY (28 U.S.C. § 1605A(c))**

220.     Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

221.     At the time of the events at issue, Iran was designated as a state sponsor of terrorism and remains so designated today.

222.     Iran provided material support and resources to the Taliban for the purpose of supporting, enabling, advancing, and benefitting from the terrorist activities of the Taliban, including through the fomenting of general unrest in Afghanistan and the commission of attacks against United States personnel and interests.

223.     As such, Iran's provision of material support and resources to the Taliban was and is intentional, wanton, and willful, with the explicit understanding that violence against Americans, such as Bradley Busby, is an expected and welcomed result of those actions.

224.     Such conduct violates 28 U.S.C. § 1605A.

225.     A private right of action is established under 28 U.S.C. § 1605A(c) for violations of that section leading to injuries that "may include economic damages, solatium, pain and suffering, and punitive damages."

226.     The Camp Sullivan Attack was an unauthorized, illegal, and deliberate use of physical force resulting in substantial human casualties, executed with the attempt to bring about injuries and/or death to United States citizens.

227.      As a direct and proximate result of Iran's willful, wrongful, and intentional acts, Bradley Busby was injured in the Camp Sullivan Attack.

228.     Iran's continuing provision of material support to those willing to commit murder, and other terrorist acts, such as the Taliban, is criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages.

## COUNT XIII – PROVISION OF MATERIAL SUPPORT FOR THE ATTEMPTED EXTRAJUDICIAL KILLING OF ROBERT HERNANDEZ (28 U.S.C. § 1605A(c))

229.     Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

230.     At the time of the events at issue, Iran was designated as a state sponsor of terrorism and remains so designated today.

231.     Iran provided material support and resources to the Taliban for the purpose of supporting, enabling, advancing, and benefitting from the terrorist activities of the Taliban, including through the fomenting of general unrest in Afghanistan and the commission of attacks against United States personnel and interests.

232.    As such, Iran's provision of material support and resources to the Taliban was and is intentional, wanton, and willful, with the explicit understanding that violence against Americans, such as Robert Hernandez, is an expected and welcomed result of those actions.

233.    Such conduct violates 28 U.S.C. § 1605A.

234.    A private right of action is established under 28 U.S.C. § 1605A(c) for violations of that section leading to injuries that "may include economic damages, solatium, pain and suffering, and punitive damages."

235.    The Camp Sullivan Attack was an unauthorized, illegal, and deliberate use of physical force resulting in substantial human casualties, executed with the attempt to bring about injuries and/or death to United States citizens.

236.     As a direct and proximate result of Iran's willful, wrongful, and intentional acts, Robert Hernandez was injured in the Camp Sullivan Attack.

237.    As a direct and proximate result of Iran's actions, Jennifer Hernandez has experienced significant solatium damages including, but not limited to, severe mental anguish and harm caused by the loss of Robert Hernandez' society and comfort.

238.    Iran's continuing provision of material support to those willing to commit murder, and other terrorist acts, such as the Taliban, is criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court award damages to Plaintiffs against Iran on all Counts, and grant Plaintiffs:

For Count I, the following:

    a.  Compensatory damages for personal injuries to Ryan Hammons, including pain and suffering and economic damages in the amount of $15,000,000, or a sum certain to be determined at trial;

    b.  Solatium damages in a total amount of $8,000,000, comprised of the following sums:

        -  $8,000,000 on behalf of Noree Kamkongkaeo, wife of Ryan Hammons;

    c.  Punitive damages in the amount of $150,000,000, allocated proportionately with the compensatory judgments awarded to the family of Ryan Hammons;

    d.  Interest, from January 4, 2016 until the date of judgment; and

    e.  Such other and further relief as the Court may determine to be just and equitable under the circumstances.

For Count II, the following:

    a.  Compensatory damages for personal injuries to Aaron Money, including pain and suffering and economic damages in the amount of $15,000,000, or a sum certain to be determined at trial;

    b.  Solatium damages in a total amount of $5,000,000, comprised of the following sums:

        -  $5,000,000 on behalf of Rhett Money, father of Aaron Money;

    c.  Punitive damages in the amount of $150,000,000;

    d.  Interest, from January 4, 2016 until the date of judgment; and

    e.  Such other and further relief as the Court may determine to be just and equitable under the circumstances.

For Count III, the following:

    a.  Compensatory damages for personal injuries to Andrew Babbitt, including pain and suffering and economic damages in the amount of $15,000,000, or a sum certain to be determined at trial;

    b.  Solatium damages in a total amount of $33,000,000, comprised of the following sums:

- $8,000,000 on behalf of Ashley Babbitt, wife of Andrew Babbitt;

- $5,000,000 on behalf of M.A.B., son of Andrew Babbitt;

- $5,000,000 on behalf of M.L.B., son of Andrew Babbitt;

- $5,000,000 on behalf of O.R.B., daughter of Andrew Babbitt;

- $5,000,000 on behalf of Sylvia Babbitt, mother of Andrew Babbitt;

- $2,500,000 on behalf Lee Babbitt III, brother of Andrew Babbitt;

- $2,500,000 on behalf Christi Babbitt, sister of Andrew Babbitt;

c.  Punitive damages in the amount of $150,000,000, allocated proportionately with the compensatory judgments awarded to the family of Andrew Babbitt;

d.  Interest, from January 4, 2016 until the date of judgment; and

e.  Such other and further relief as the Court may determine to be just and equitable under the circumstances.

For Count IV, the following:

a.  Compensatory damages for personal injuries to Ryan Buytenhuys, including pain and suffering and economic damages in the amount of $15,000,000, or a sum certain to be determined at trial;

b.  Solatium damages in a total amount of $25,000,000, comprised of the following sums:

- $5,000,000 on behalf of Cameron Buytenhuys, son of Ryan Buytenhuys;

- $5,000,000 on behalf of E.B., son of Ryan Buytenhuys;

- $5,000,000 on behalf of Darroll Buytenhuys, father of Ryan Buytenhuys;

- $5,000,000 on behalf of Adele Buytenhuys, mother of Ryan Buytenhuys;

- $2,500,000 on behalf Clinton Buytenhuys, brother of Ryan Buytenhuys;

- $2,500,000 on behalf Sheldon Buytenhuys, brother of Ryan Buytenhuys;

c. Punitive damages in the amount of $150,000,000, allocated proportionately with the compensatory judgments awarded to the family of Ryan Buytenhuys;

d. Interest, from January 4, 2016 until the date of judgment; and

e. Such other and further relief as the Court may determine to be just and equitable under the circumstances.

For Count V, the following:

a. Compensatory damages for personal injuries to Dale Smith, Jr., including pain and suffering and economic damages in the amount of $15,000,000, or a sum certain to be determined at trial;

b. Solatium damages in a total amount of $38,000,000, comprised of the following sums:

- $8,000,000 on behalf of Bianca Smith, wife of Dale Smith, Jr.;

- $5,000,000 on behalf of Gabrielle Smith, daughter of Dale Smith, Jr.;

- $5,000,000 on behalf of A.R.S., daughter of Dale Smith, Jr.;

- $5,000,000 on behalf of I.M.S., daughter of Dale Smith, Jr.;

- $5,000,000 on behalf of Annie Smith, mother of Dale Smith, Jr.;

- $5,000,000 on behalf of Dale Smith, Sr., father of Dale Smith, Jr.;

- $2,500,000 on behalf Nicola Ravenstein, sister of Dale Smith, Jr.;

- $2,500,000 on behalf Sheena Smith, sister of Dale Smith, Jr.;

c. Punitive damages in the amount of $150,000,000, allocated proportionately with the compensatory judgments awarded to the family of Dale Smith, Jr.;

d. Interest, from January 4, 2016 until the date of judgment; and

e. Such other and further relief as the Court may determine to be just and equitable under the circumstances.

For Count VI, the following:

    a. Compensatory damages for personal injuries to Derek Pleiman, including pain and suffering and economic damages in the amount of $15,000,000, or a sum certain to be determined at trial;

    b. Solatium damages in a total amount of $8,000,000, comprised of the following sums:

       - $8,000,000 on behalf of Erica Pleiman, wife of Derek Pleiman;

    c. Punitive damages in the amount of $150,000,000, allocated proportionately with the compensatory judgments awarded to the family of Derek Pleiman;

    d. Interest, from January 4, 2016 until the date of judgment; and

    e. Such other and further relief as the Court may determine to be just and equitable under the circumstances.

For Count VII, the following:

    a. Compensatory damages for personal injuries to Brandon Jones, including pain and suffering and economic damages in the amount of $15,000,000, or a sum certain to be determined at trial;

    b. Punitive damages in the amount of $150,000,000;

    c. Interest, from January 4, 2016 until the date of judgment; and

    d. Such other and further relief as the Court may determine to be just and equitable under the circumstances.

For Count VIII, the following:

    a. Compensatory damages for personal injuries to Robert Nadeau II, including pain and suffering and economic damages in the amount of $15,000,000, or a sum certain to be determined at trial;

    b. Solatium damages in a total amount of $33,000,000, comprised of the following sums:

       - $8,000,000 on behalf of Miranda Nadeau, wife of Robert Nadeau II;

       - $5,000,000 on behalf of Haley Schweickert, daughter of Robert Nadeau II

- $5,000,000 on behalf of Taylor-Rae Simon, daughter of Robert Nadeau II;

- $5,000,000 on behalf of Jenna Schweickert, daughter of Robert Nadeau II;

- $5,000,000 on behalf of A.L.N., daughter of Robert Nadeau II;

- $5,000,000 on behalf of Robert Nadeau, father of Robert Nadeau II;

c. Punitive damages in the amount of $150,000,000, allocated proportionately with the compensatory judgments awarded to the family of Robert Nadeau II;

d. Interest, from January 4, 2016 until the date of judgment; and

e. Such other and further relief as the Court may determine to be just and equitable under the circumstances.

For Count IX, the following:

a. Compensatory damages for personal injuries to William Harris, including pain and suffering and economic damages in the amount of $15,000,000, or a sum certain to be determined at trial;

b. Solatium damages in a total amount of $8,000,000, comprised of the following sums:

- $8,000,000 on behalf of Andria Harris, wife of William Harris;

c. Punitive damages in the amount of $150,000,000, allocated proportionately with the compensatory judgments awarded to the family of William Harris;

d. Interest, from January 4, 2016 until the date of judgment; and

e. Such other and further relief as the Court may determine to be just and equitable under the circumstances.

For Count X, the following:

a. Compensatory damages for personal injuries to Allen Cox, including pain and suffering and economic damages in the amount of $15,000,000, or a sum certain to be determined at trial;

b. Punitive damages in the amount of $150,000,000;

c. Interest, from January 4, 2016 until the date of judgment; and

    d.  Such other and further relief as the Court may determine to be just and equitable under the circumstances.

For Count XI, the following:

    a.  Compensatory damages for personal injuries to David Evans, including pain and suffering and economic damages in the amount of $15,000,000, or a sum certain to be determined at trial;

    b.  Solatium damages in a total amount of $8,000,000, comprised of the following sums:

        -  $8,000,000 on behalf of Tashia Evans, wife of David Evans;

    c.  Punitive damages in the amount of $150,000,000, allocated proportionately with the compensatory judgments awarded to the family of David Evans;

    d.  Interest, from January 4, 2016 until the date of judgment; and

    e.  Such other and further relief as the Court may determine to be just and equitable under the circumstances.

For Count XII, the following:

    a.  Compensatory damages for personal injuries to Bradley Busby, including pain and suffering and economic damages in the amount of $15,000,000, or a sum certain to be determined at trial;

    b.  Punitive damages in the amount of $150,000,000;

    c.  Interest, from January 4, 2016 until the date of judgment; and

    d.  Such other and further relief as the Court may determine to be just and equitable under the circumstances.

For Count XIII, the following:

    a.  Compensatory damages for personal injuries to Robert Hernandez, including pain and suffering and economic damages in the amount of $15,000,000, or a sum certain to be determined at trial;

    b.  Solatium damages in a total amount of $8,000,000, comprised of the following sums:

- $8,000,000 on behalf of Jennifer Hernandez, wife of Robert Hernandez;

c. Punitive damages in the amount of $150,000,000, allocated proportionately with the compensatory judgments awarded to the family of Robert Hernandez;

d. Interest, from January 4, 2016 until the date of judgment; and

e. Such other and further relief as the Court may determine to be just and equitable under the circumstances.

PLAINTIFFS DEMAND A TRIAL BY JURY.


Dated: August 20, 2019                              Respectfully submitted,


      /s/ Kevin A. Hoffman_____
Randy D. Singer (DCD Bar No. VA057)
Kevin A. Hoffman (DC Bar No. 1044559)
SINGER DAVIS, LLC
1209A Laskin Road
Virginia Beach, VA 23451
Phone: (757) 301-9995
Fax: (757) 233-1084
Email: randy.singer@singerdavis.law
Email: kevin.hoffman@singerdavis.law
*Counsel for Plaintiffs*