**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **RYAN HAMMONS et al.,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| v. | )  Case No. 1:19cv2518 |
| | ) |
| **ISLAMIC REPUBLIC OF IRAN,** | ) |
| | ) |
| **Defendant.** | ) |

**MEMORANDUM IN SUPPORT OF
PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT**

Plaintiffs, Ryan Hammons et al. (collectively referred to herein as "Plaintiffs") come before this Court on a Motion seeking an Order finding Defendant, the Islamic Republic of Iran ("Iran"), liable for Plaintiffs' injuries and appointing a special master for the purpose of hearing evidence as to damages, *see* ECF No. 18. In support thereof, Plaintiffs state as follows:

**I.    STATEMENT OF FACTS**

On January 4, 2016, at approximately 6:34 pm local time in Kabul, Afghanistan, a truck containing over three thousand pounds of explosive material was detonated on a narrow roadway between Camp Sullivan and Darya Village, adjacent properties located near the Kabul International Airport and used to support and house United States embassy personnel and civilian contractors (the "Camp Sullivan Attack"). *See, e.g.*, Ex. 2 at ¶¶ 4–6. The explosion injured more than thirty people, including Plaintiffs Ryan Hammons, Aaron Money, Andrew Babbitt, Ryan Buytenhuys, Dale Smith, Jr., Derek Pleiman, Brandon Jones, Robert Nadeau II, William Harris, Allen Cox, David Evans, Bradley Busby, and Robert Hernandez (collectively, the "Camp Sullivan Victims"). *See* Exs. 2–14. The Camp Sullivan Attack was carried out by the

Taliban, *see* Ex. 1 at ¶¶ 15–18, 57, a group that was, at the relevant time, trained, funded, supplied, directed, and encouraged by Iran.

The following facts are substantiated with documentary evidence, public admissions, statements against interest, expert testimony through the attached Expert Affidavit of Phillip Smyth ("Ex. 1"), factual testimony from the Camp Sullivan Victims ("Exs. 2–14"), and photographic evidence ("Ex. 15"). Plaintiffs are prepared to rest on this written submission, or to present this evidence to the Court at a live or video hearing, through video deposition testimony, or to supplement it with additional written submissions upon request.

### A. Iran's Substantial and Pervasive Support for International Terrorism

Since the Iranian revolution in 1979, Iran has engaged in and supported terrorist organizations and acts of terrorism as an instrument of its foreign policy. Ex. 1 at ¶ 52. As a result of its incessant and widespread support for terrorist groups such as Hezbollah, Hamas, and the Taliban, the State Department formally designated Iran as a state sponsor of terrorism in 1984. 49 Fed. Reg. 2836 (Jan. 23, 1984). Iran's support for terrorism is largely carried out by a paramilitary force known as the Islamic Revolutionary Guard Corp ("IRGC"). Although supervised by the Iranian Parliament, the IRGC is an agent and instrumentality of the Supreme Leader of Iran, Ayatollah Ali Hosseini Khamenei, who is the commander and chief of the armed forces. The IRGC was designated as a Foreign Terrorist Organization in 2019. U.S. Department of State, Designation of the Islamic Revolutionary Guard Corps (Apr. 8, 2019), *available at* https://www.state.gov/designation-of-the-islamic-revolutionary-guard-corps/.

Within the IRGC is a branch known as the Qods Force ("IRGC-QF"), which is responsible for promoting the ideals of the Iranian Revolution abroad. *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 59 (D.D.C. 2018). The IRGC-QF has a long and well-documented

history of assassinations, kidnappings, bombings, and arms dealing, and is one of the most organized, disciplined, and deadly organizations in the world. The IRGC-QF's activities, which include providing, funding, and supporting foreign terrorist organizations including Hezbollah, al Qaeda, and the Taliban, are known and sanctioned by Iran's Supreme Leader and are carried out as an official platform of Iran's foreign policy. *Id.* Consequently, the Treasury Department has designated the IRGC-QF as a "terrorist organization" and the State Department has designated the IRGC-QF as a "foreign terrorist organization." *See, e.g.*, U.S. Department of the Treasury, Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism (Oct. 25, 2007), *available at* https://www.treasury.gov/press-center/press-releases/pages/hp644.aspx.

   B.   **The Taliban-Iran Relationship.**

  Although Iran is a Shia Muslim nation and the Taliban is a Sunni Muslim organization, this has not prevented them from conspiring together in pursuit of violent anti-American activities. Ex. 1 at ¶ 61; *see also* U.S. Department of Defense, Annual Report on Military Power of Iran (Apr. 2012) (even though "Tehran's support to the Taliban is inconsistent with their historic enmity, it complements Iran's strategy of backing many groups to maximize its influence while also undermining U.S. and [NATO] objectives by fomenting violence"). Iran supports the Taliban not for ideological reasons, but as part of its regional strategy to oppose the presence of the United States in the Middle East through increased American cost and casualties. Ex. 1 at ¶ 63. Although the Taliban and Iran often differ on their ultimate goals and motives, the shared strategy of attacking American interests has consistently brought them together, particularly once the United States invaded Afghanistan following 9/11. *Id.* at ¶ 59.

As early as February 2002, the United States government had already recognized a turn in Iran's motivations in the Afghanistan theater as reflected in the CIA Director's testimony before Congress:

> The initial signs of Tehran's cooperation and common cause with us in Afghanistan are being eclipsed by Iranian efforts to undermine US influence there. While Iran's officials express a shared interest in a stable government in Afghanistan, its security forces appear bent on countering the US presence. This seeming contradiction in behavior reflects deep-seated suspicions among Tehran's clerics that the United States is committed to encircling and overthrowing them-a fear that could quickly erupt in attacks against our interests.

Testimony of Hon. George J. Tenet, Current and Projected National Security Threats to the United States, S. Hrg. 107-597 (Feb. 6, 2002). During this same period, Iran accelerated its pattern of providing material support to proxy militia groups throughout the Middle East, enabling them to inflict damage on Iran's enemies without the need for direct Iranian involvement. Ex. 1 at ¶ 24. The Mahdi Army, Hamas, and Lebanese Hizballah are three high profile examples. *See id.* at ¶¶ 25–26, 35–37. As a natural extension of this strategy, Iran applied the same proxy model to the Taliban in Afghanistan. *Id.* at ¶ 38. As one Taliban commander put it: "Our religions and histories are different, but the goal is the same. We both want to kill Americans." Miles Amoore, *Iranian military teaches Taliban fighters the art of ambush*, The Sunday Times, Mar. 21, 2010.

According to the United States Department of State, "[s]ince 2006, Iran has arranged arms shipments to select Taliban members, including small arms and associated ammunition, rocket propelled grenades, mortar rounds, 107mm rockets, and plastic explosives." Ex. 1 at ¶ 27 (citing United States Department of State, Country Reports on Terrorism, 2012, p. 196). A variety of government findings and open source reporting supports this conclusion. *See, e.g.*, *id.* at ¶ 26.

By 2007 and 2008, concrete evidence of Iranian weapons transfers to the Taliban began to surface. *See, e.g.*, *id.* at ¶¶ 26–29. In 2009, U.S. Army General Stanley McChrystal referred to Iran's role in Afghanistan as "ambiguous . . . providing developmental assistance and political support to [the Afghan government] while the [IRGC-QF] is reportedly training fighters for certain Taliban groups and providing other forms of military assistance to insurgents." Stanley A. McChrystal, COMISAF'S Initial Assessment, Secretary of Defense Memorandum June 2009, Initial United States Forces – Afghanistan (USFOR-A) Assessment (Aug. 30, 2009). General McChrystal correctly forecasted that "Iran has the capability to threaten the mission in the future." *Id.* Iran's provision of advance explosives during this timeframe was "[a]n important turning point [in the war between the U.S. and the Taliban]." Ex. 1 at ¶ 28 (citing Antonio Giustozzi, The Taliban At War: 2001–2018, Oxford University Press, (2019), p. 141).

In addition to weapons and military training, Iran also provided material support to the Taliban through financial assistance and motivation. Most directly, Iran has maintained a bounty system for Taliban fighters through which it paid "$1,000 per killed U.S. serviceman and $6,000 for each destroyed U.S. vehicle." *Id.* at ¶ 55. These financial incentives provided both capability and motivation for attacks against Americans. *Id.* at ¶ 56.

Iran also provides substantial financial benefits to the Taliban through its state-sanctioned enabling of the narcotics trade. The Taliban has an annual budget running between $400 million and $1 billion, a large portion of which is obtained through drug cultivation and distribution. *Id.* at ¶ 49. An Iranian general within the IRGC-QF, acting in his official capacity, was sanctioned by the United States government for allowing "Afghan narcotics traffickers to smuggle opiates through Iran in return for assistance." U.S. Department of the Treasury, Treasury Designates Iranian Qods Force General Overseeing Afghan Heroin Trafficking

Through Iran, March 7, 2012; *see also* Ex. 1 at ¶ 50. Such "assistance" included smuggling "weapons to the Taliban" on behalf of the IRGC-QF. *Id.*

Senior Iranian military officers have been implicated in a variety of schemes to provide material support and resources to the Taliban. On August 3, 2010, the Treasury Department designated IRGC-QF General Hossein Musavi and Colonel Hasan Mortezavi for their roles in providing "financial and material support to the Taliban." United States Department of the Treasury, Fact Sheet: U.S. Treasury Department Targets Iran's Support for Terrorism Treasury Announces New Sanctions Against Iran's Islamic Revolutionary Guard Corps-Qods Force Leadership (Aug. 3, 2010). In February 2014, the Treasury Department designated two more IRGC-QF officers, Alireza Hemmati and Akbar Seyed Alhosseini, for their role in "funneling Iranian assistance to the Taliban" and providing "logistical support" towards the planning and executing terrorist attacks. Ex. 1 at ¶ 27 (citing United States Department of the Treasury, Treasury Targets Networks Linked to Iran, (Feb. 6, 2014)).

Following the Camp Sullivan Attack, Iran's material support for the Taliban has continued. On October 23, 2018, the Treasury Department announced the designation of eight individuals pursuant to Executive Order 13224 as a result of an international effort to curb Iran's illicit support for the Taliban. *See* United States Department of the Treasury, Treasury and the Terrorist Financing Targeting Center Partners Sanction Taliban Facilitators and their Iranian Supporters (Oct. 23, 2018). These men included Mohammad Ebrahim Owhadi, an IRGC-QF officer that reached an agreement in 2017 with a Taliban governor, Esma'il Razavi, who acted "for or on behalf of IRGC-QF and for assisting in, sponsoring, or providing financial, material, or technological support for, or financial or other services to or in support of, the Taliban," and

Abdullah Samad Faroqui, the Taliban governor who conspired with Owhadi to further the training and support relationship between the Taliban and Iran. *Id.*

In June 2015, approximately six months before the Camp Sullivan Attack, a Taliban commander stated that "Iran supplies us with whatever we need."

### C.  The Camp Sullivan Attack.

Camp Sullivan and Darya Village are adjacent complexes located near Kabul International Airport, separated from one another by a narrow roadway. *See* Ex. 15 at 1. These secured complexes are used to house embassy personnel and private civilian contractors. The Camp Sullivan Victims were each employed as private contractors for the United States Government, primarily for the purpose of providing security services to other American personnel. *See, e.g.*, Ex. 12 at ¶ 4. They resided in various buildings within Camp Sullivan and Darya Village. *See, e.g.*, Ex. 2 at ¶ 4.

On the evening of January 4, 2016, many of the Camp Sullivan Victims were eating dinner in the chow hall of Darya Village, while others were located at various other points throughout the two compounds. *See, e.g.*, Ex. 2 at ¶ 5. Earlier that evening, members of the Taliban parked a truck containing more than three thousand pounds of explosive material on the small road running between Camp Sullivan and Darya Village. Shortly after 6:30pm, the explosive material in the truck was detonated, leading to a massive explosion. Ex. 2 at ¶ 6; Ex. 12 at ¶ 7.

The impact of the blast within the chow hall was "enormous." Ex. 12 at ¶ 8. The concussive force from the explosion caused the people inside to be thrown to the ground. *Id.* In the same building, the blast collapsed hallways, offices, and sleeping quarters. *See, e.g.*, Ex. 2 at ¶¶ 8–9. The enormous impact from the blast hurled chunks of concrete from the barrier lining the

perimeter through the outer walls of the buildings and into various rooms. Ex. 12 at ¶ 11. The crater left in the roadway was approximately sixty feet wide and twenty feet deep. Ex. 6 at ¶ 22; *see also* Ex. 15 at 2–3.

In the weeks leading up the Camp Sullivan Attack, the Camp Sullivan Victims received various intelligence and safety briefings about a heightened Taliban threat in the area. Ex. 12 at ¶ 19. After the fact, it was understood by those involved that the Camp Sullivan Attack was executed by the Taliban. Ex. 2 at ¶ 23. Plaintiffs' expert agrees, stating that "[t]he size, manner, and location of the Camp Sullivan attack suggest it was more likely than not carried out by the Taliban." Ex. 1 at ¶¶ 15, 57. The Taliban claimed responsibility for the Camp Sullivan Attack that same day via the Twitter account of their official spokesman. Ex. 1 at ¶¶ 16–18; Ex. 2 at ¶ 22; *see also* United States Department of State, Country Reports on Terrorism 2016 at 237. It is also worth noting that, unlike many other attacks, no other group even claimed responsibility for this incident.

## II.    LEGAL STANDARD FOR ENTRY OF DEFAULT

In cases brought under exceptions to the Foreign Sovereign Immunities Act ("FSIA"), the district "court cannot simply enter default judgment; rather, out of respect for the principle of sovereign immunity, it must ensure that the plaintiffs have established their claim or right to relief by evidence that is satisfactory to the court." *Estate of Botvin v. Islamic Republic of Iran*, 873 F. Supp. 2d 232, 236 (D.D.C. 2012); *see also* 28 U.S.C. § 1608(e). This standard is consistent with the standard for entry of default judgment against the United States of America under Rule 55(d) of the Federal Rules of Civil Procedure. *Hall v. Republic of Iraq*, 328 F. 3d 680, 683–84 (D.C. Cir. 2003). In this circumstance, "the FSIA leaves it to the court to determine

precisely how much and what kinds of evidence the plaintiff must provide." *Kim v. Democratic People's Republic of Korea*, 774 F. 3d 1044, 1047 (D.C. Cir. 2014).

Although "[t]he Court must scrutinize the plaintiff's allegations," *Bluth v. Islamic Republic of Iran*, No. 12cv250, 2016 WL 4491760, at *10 (D.D.C. Aug. 25, 2016), it should also "accept as true the plaintiffs' uncontroverted evidence," *see Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 100 (D.D.C. 2000); *see also Bennett v. Islamic Republic of Iran*, 507 F. Supp. 2d 117, 125 (D.D.C. 2007). Plaintiffs may present their evidence in the form of sworn affidavits, *see Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 211 (D.D.C. 2012*); see also Kim*, 774 F. 3d at 1050, by asking the Court to "take judicial notice of related proceedings and records," *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 109 n.6 (D.D.C. 2005), and, if the Court desires, through live testimony at an evidentiary hearing, *c.f. Bodoff v. Islamic Republic of Iran*, 424 F. Supp. 2d 74, 78 (D.D.C. 2006) (reviewing the procedural history in which a "motion to proceed by affidavit" was granted).

### III.   SERVICE OF PROCESS

"In order to sue a foreign state or one of its political subdivisions, a plaintiff must effect service in compliance with the [FSIA]." <u>Barot v. Embassy of the Republic of Zambia</u>, 785 F.3d 26, 27 (D.C. Cir. 2015). The FSIA prescribes four methods for obtaining proper service. *See* 28 USC § 1608(a)(1)–(4). These methods must be attempted in order, but only to the extent that each step is feasible in a specific case or applicable to a specific defendant. *Id*.

The first two methods of service under Section 1608 do not apply here. Plaintiffs have no "special arrangement" for service with Iran and Iran is not a party to "any applicable international convention on service of judicial documents." *See* 28 U.S.C. § 1608(a)(1)–(2);

*Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 70 (D.D.C. 2010). Therefore, Plaintiffs need not, and did not, attempt the first two steps under Section 1608 in this case.

Plaintiffs initiated the third method, under 28 U.S.C. § 1608(a)(3), service by mailing to the head of the ministry of foreign affairs, via registered mail through the United States Postal Service on September 13, 2019. ECF No. 7. The Clerk executed this request on September 30, 2019. ECF No. 9. Delivery by this method was rejected by Iran.

On November 5, 2019, after waiting the thirty days required by Section 1608, Plaintiffs initiated the fourth and final method, service via diplomatic process. ECF No. 10. The Clerk executed this request on November 19, 2019 by mailing the relevant documents to the State Department. ECF No. 12. On March 13, 2020, the State Department filed its Return of Service/Affidavit indicating that "[t]he documents were delivered to the Iranian Ministry of Foreign Affairs under cover of diplomatic note No. 1027-IE, dated February 11, 2020 and delivered on February 12, 2020." ECF No. 14.

## IV. JURISDICTION

### A. Subject Matter Jurisdiction

A federal district court has subject matter jurisdiction over "any nonjury civil action against a foreign state," so long as one of the FSIA's enumerated exceptions to sovereign immunity applies. *See* 28 USC § 1330(a). In this case, Iran is subject to suit under the FSIA's terrorism exception. *See* 28 USC § 1605A(a). This provision dictates that a defendant state "shall not be immune" if: (1) it is designated as a state sponsor of terrorism; (2) the victim was a United States national; and (3) money damages are sought for personal injury or death caused by an act

of torture, extrajudicial killing, hostage taking, or the material support of any such acts. 28 U.S.C. § 1605A(a)(1)–(2).[1]

### 1. Iran is a State Sponsor of Terrorism.

The first element, Iran's status as a designated state sponsor of terrorism, is a matter of public record. *See* 49 Fed. Reg. 2836-02 (Jan. 23, 1984) (statement of Secretary of State George P. Shultz). Plaintiffs therefore request that the Court take judicial notice that Iran is a designated State Sponsor of Terrorism, and has continuously held that designation for decades, including at all times relevant to this case. *See* U.S. Dep't of State, *State Sponsors of Terrorism*, *available at* https://www.state.gov/j/ct/list/c14151.htm; *Estate of Hirshfeld v. Islamic Republic of Iran*, 330 F. Supp. 3d 107, 133 (D.D.C. 2018); *Valore*, 700 F. Supp. 2d at 67.

### 2. The Camp Sullivan Victims are American Citizens.

The second element requires Plaintiffs to prove that each victim was a (1) United States national; (2) member of the American military; or (3) an individual performing a contract awarded by the United States government. 28 U.S.C. § 1605A(a)(2)(A)(ii). Here, this element is clearly met because all the Camp Sullivan Victims were American citizens at the time of the Camp Sullivan Attack and remain so today. *See* Exs. 2–14 at ¶ 1.

### 3. Iran Provided Material Support and Resources to the Taliban, proximately causing the attempted extra-judicial killing of the Camp Sullivan Victims.

Plaintiffs satisfy the third element necessary for a waiver of sovereign immunity because their claims involve: (a) attempted extra-judicial killings; (b) proximately caused by the material

---

[1] Section 1605A(a)(2) also requires the claimant to give the foreign state an offer to arbitrate the claim if the act occurred within the foreign state against which the claim is brought. This requirement is irrelevant in this case because the alleged injuries occurred within the Islamic Republic of Afghanistan and the claim is brought against Iran.

11

support and resources that Iran provided to the Taliban; (c) resulting in personal injuries to the Camp Sullivan Victims.

### a. The Camp Sullivan Victims were subjected to deliberated attempted acts of extra-judicial killing.

The FSIA's terrorism exception defines the act extra-judicial killing by reference to the Torture Victim Protection Act of 1991 ("TVPA"). *See* 28 U.S.C. § 1605A(h)(7). Accordingly, an "extra-judicial killing" is "a deliberate killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." Pub. L. No. 102-256, § 3(a), 106 Stat. 73.

Although the plain text of this statutory provision does not expressly address attempted acts, given the FSIA's stated purpose, any "ambiguities [should be interpreted] flexibly and capaciously." *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 99 (D.D.C. 2017) (quoting *Van Beneden v. Al-Sanusi*, 709 F.3d 1165, 1167 n.4 (D.C. Cir. 2013). Importantly, the definition of "extra-judicial killing" within the TVPA has been previously interpreted to "allow[] plaintiffs to assert liability for a defendant's attempted extrajudicial killing, even if no one died as a result of that attempt." *Id.* (citing *Warfaa v. Ali*, 33 F. Supp. 3d 653, 666 (E.D. Va. 2014); *Doe v. Constant*, No. 04cv10108, 2006 WL 3490503 at 9 n.3 (S.D.N.Y. Oct. 24, 2006)). Therefore, in this statutory context, "deliberated" attempts to kill, regardless of whether they actually result in deaths, "fall within the scope of Section 1605A(a)(1)." *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 58 (D.D.C. 2019).

The circumstances surrounding the Camp Sullivan Attack, which include a truck laden with 3,000 pounds of explosives being detonated in close proximity to residential quarters within a densely populated area, clearly indicate a "deliberated" attempt to kill. Evidence supporting this conclusion includes first-hand eyewitness testimony from the Camp Sullivan Victims, *see,*

*e.g.*, Exs. 2, 6, 12, photographs of the detonation site, *see, e.g.*, Ex. 15, and the affirmative admission of the Taliban, *see* Ex. 1 at ¶¶ 15–18, 57. Plaintiffs submit that this evidence is sufficient to establish that an act of attempted extrajudicial killing was perpetrated against the Camp Sullivan Victims on January 4, 2016.

> b. *Iran's provision of material support to the Taliban proximately caused the Camp Sullivan Attack.*

The term "caused by" found in 28 U.S.C. § 1605A(c) requires "only a showing of proximate cause." *See Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir. 2004) (discussing the prior statutory framework, but in the same context and using the same language). A district court should find that "[p]roximate cause exists so long as there is 'some reasonable connection between the act or omission of the [state sponsor] and the damages which the plaintiff has suffered.'" *Estate of John Doe v. Islamic Republic of Iran,* 808 F.Supp.2d 1, 16 (D.D.C. 2011). The purpose of this exercise is "to preclude liability in situations where the causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity." *Paroline v. United States*, 572 U.S. 434, 445 (2014).

Accordingly, proving proximate cause in FISA cases is boiled down to two elements. First, the state sponsor's "actions must be a substantial factor in the sequence of events that led to plaintiff's injury." *Estate of Hirshfeld v. Islamic Republic of Iran*, 330 F. Supp. 3d 107, 135 (D.D.C. 2018) (quoting *Owens v. Republic of Sudan*, 864 F.3d 751, 794 (D.C. Cir. 2017)). Second, the injuries alleged "must have been reasonably foreseeable or anticipated as a natural consequence of the defendant's conduct." *Id.* When the defendant state is acting through a proxy, such as the Taliban, the proxy's actions must also be reasonably foreseeable to the state sponsor at the time of the provision of material support to that proxy organization. *Doe*, 808 F.Supp.2d at 16.

13

According to Plaintiffs' expert witness, "there is no reasonable explanation of the facts other than that the bombing was carried out by the Taliban. Ex. 1 at ¶ 57. This conclusion is supported by "[t]he size, manner, and location of" the attack, *id.* at ¶ 15; Ex. 2 at ¶ 23, as well as the Taliban's public admissions. Ex. 1 at ¶¶ 15–18. The Camp Sullivan Victims also received various briefings detailing a heightened Taliban threat in the area shortly before the attack. *See* Ex. 12 at ¶ 19. There is no relevant evidence to contradict the reasonable assertion that the Camp Sullivan Attack was executed by the Taliban.

Having established that the Taliban was the proxy group that attempted extra-judicial killings of the Camp Sullivan Victims, it remains necessary for Plaintiffs to also show that Iran provided material support and resources to the Taliban that were "a substantial factor" leading to the Camp Sullivan Attack, and that the Camp Sullivan Attack was "reasonably foreseeable or anticipated as a natural consequence" of Iran's provision of material support to the Taliban. *See Owens*, 864 F.3d at 794.

> i. Iran's provision of material support to the Taliban was a substantial factor in executing the Camp Sullivan Attack.

Iran's history of providing material support to the Taliban is long and well-documented. This support can be broken down into three basic categories – weapons, training, and financing – all of which were related to the successful execution of the Camp Sullivan Attack.

Beginning in 2006, the United States government began recording numerous instances of Iranian state-sanctioned arms transfers directly to the Taliban. Notably included among the materials provided were "plastic explosives." Ex. 1 at ¶ 27. Assembling the materials needed to create a 3,000-pound explosive device is not a simple proposition, particularly under the scrutiny of the United States military. Iran's willingness to provide the Taliban with whatever they

14

needed, so long as the targets were Americans, was a substantial factor in the Taliban's capability to execute a large explosive attack such as the Camp Sullivan Attack.

In 2015, Iran stepped up its commitment to the Taliban, including the creation of two specialized training camps for the express purpose of educating the Taliban's best fighters in advanced tactics. *Id.* at ¶¶ 41–42. Those advanced tactics included the capability for large vehicle-based explosive devices, also known as VBIEDs, the same type of device used in the Camp Sullivan Attack. *Id.* In exchange for this training, the Taliban agreed to use these new tactics primarily for attacking American and NATO interests. *Id.* This reported behavior is consistent with historical Iranian tactics when training other proxy groups, such as Lebanese Hizballah, al-Qaeda, Hamas, and Palestinian Islamic Jihad, in the use of VBIEDs. *See id.* at ¶¶ 34–40.

Iran's financial assistance to the Taliban was both direct and indirect. Iran has maintained a bounty system for Taliban fighters through which it pays "$1,000 per killed U.S. serviceman and $6,000 for each destroyed U.S. vehicle." Ex. 1 at ¶ 55. More sizably, albeit less directly, Iran also provides financial assistance to the Taliban by enabling the narcotics trade. Official Iranian military operations were used to allow Afghan narcotics traffickers to smuggle opiates through Iran for the purpose of funding acts of terrorism. *See* Ex. 1 at ¶ 50. These schemes allowed the Taliban to profit from its narcotics cultivation and trade on a scale not otherwise possible without state-sponsored assistance.

Beyond these direct instances of support, Iran's longstanding support of terrorism through encouragement of VBIEDs as a means of attack is also a substantial factor in this case. Iran purposefully teaches these tactics to its proxies as a way to show strength and communicate to its opponents that it is capable of influencing the security status in the area. Id. at ¶¶ 32–33.

Plaintiffs' expert describes VBIEDs as a "hallmark" of Iran's proxy warfare and shows how the Camp Sullivan Attack bore similarities to a variety of infamous assaults carried out by known Iranian proxies. *Id.* at ¶¶ 34–36.

Beyond these general links to Iran's preferred methodology, its penchant for pushing VBIEDs through its proxies also has a direct tie to the Taliban through al-Qaeda. It has been established that Iran, acting through Lebanese Hizballah, trained al-Qaeda to execute the 1998 U.S. Embassy bombings in East Africa, attacks that required similar techniques, training, and abilities as the Camp Sullivan Attack. *Id.* at ¶ 40; Final Report of the National Commission on Terrorist Attacks Upon the United States at 68 ("senior al-Qaeda operatives and trainers traveled to Iran to receive training in explosives"). At all times relevant to this case, the Taliban and al-Qaeda have maintained close ties with one another, including the sharing of tactical expertise and training between the groups. Ex. 1 at ¶ 39. Therefore, when Iran trained al-Qaeda to kill Americans – it was, in effect, providing the same knowledge and support to the Taliban.

At the time it was carried out, the Camp Sullivan Attack was the second largest bombing executed in the Afghan capital of Kabul. *Id.* at ¶ 33. This scale of attack requires access to explosive materials, fighters trained in both the construction of such a large explosive and the coordination of a large-scale attack, as well as the financial resources to execute it. Iran has provided all three components to the Taliban and was doing so long before January 2016. Not coincidentally, Iranian support to the Taliban drastically increased in the months leading up to the Camp Sullivan Attack, a period which represented "the critical juncture in Iran's shift with the Taliban." *Id.* at ¶ 41. All told, Iran's vast and varied support was a substantial factor in the Taliban's successful execution of the Camp Sullivan Attack. *Id.* at ¶ 64.

> ii.  The Camp Sullivan Attack was a reasonably foreseeable consequence of Iran's provision of material support.

The evidence shows that the Camp Sullivan Attack was not just a reasonably foreseeable consequence of Iran's support for the Taliban but an explicitly intended outcome. In fact, Iran actually incentivized the attempted killing of Americans by paying bounties of $1,000 per U.S. death and $6,000 for each destroyed American vehicle. *Id.* at ¶ 55. And when Iran trained Taliban fighters with the skills necessary to execute VBIED attacks, it did so on the condition that the training be used "on attacking American and NATO interests in Afghanistan." *Id.* at ¶ 42.

Consistent with this approach, IRGC-affiliated news outlets published their own explanation for Iran's support of the Taliban – "to counter U.S. influence in Afghanistan" and lessen the perceived threat of a future US-led invasion of Iran over the Afghanistan border. *Id.* at ¶ 22. Such a claim only serves to highlight that Iran's support of the Taliban was undertaken with the express purpose of bringing about violent acts against the United States – particularly since this effort is an essential element of a proxy strategy employed by Iran many times before throughout the Middle East. *Id.* at ¶ 34. Therefore, the Camp Sullivan Attack, a large VBIED against American personnel in Afghanistan, was a reasonably foreseeable consequence of Iran's provision of explosives, VBIED training, and money to the Taliban.

> c.  *The Camp Sullivan Attack resulted in serious personal injury.*

The massive blast from 3,000 pounds of explosive material caused extensive damage to the nearby buildings, blowing out walls, collapsing offices, and throwing chunks of concrete through walls. The debris and concussive force of the blast caused varying levels of injury to all the Camp Sullivan Victims. Exs. 2–14 at ¶ 3. These injuries included, among other things, hearing loss, dislocated joints, back and neck pain, lacerations, nerve damage, concussions,

traumatic brain injuries, and PTSD. For the purposes of establishing jurisdiction, such evidence is sufficient to prove that the Camp Sullivan Victims sustained personal injuries from the attempted extra-judicial killing.

Having satisfied all of the elements of Section 1605A(a)(1), Plaintiffs have established this Court's subject matter jurisdiction over Iran in this matter.

### B. Personal Jurisdiction

Federal district courts may exercise personal jurisdiction over a foreign state when: (1) the court has subject matter jurisdiction; and (2) the defendant is properly served. *See* 28 USC § 1330(b); *Barot v. Embassy of the Republic of Zam.*, 785 F.3d 26, 27 (D.C. Cir. 2015). Prior sections of this memoranda have set forth the basis for satisfying subject matter jurisdiction, *see supra* Section IV.A, and demonstrate that Plaintiffs obtained proper service of process, *see supra* Section III. With subject matter jurisdiction established pursuant to the terrorism exception of the FSIA and proper service obtained, this Court possesses personal jurisdiction over Iran for the purposes of this case. *See Fritz*, 320 F. Supp. 3d at 89. Venue is also proper in this Court in accordance with Title 28, Section 1391(f)(4) of the United States Code.

## V. LIABILITY

As of the date of this filing, Iran has failed to respond to the Complaint. On April 14, 2020, Plaintiffs filed an Affidavit for Default Judgment as to Iran. ECF No. 16. That same day, the Clerk of Court entered default against Iran. ECF No. 17. Plaintiffs now seek entry of default judgment against Iran and the appointment of a special master for a recommendation as to the amount of damages for each plaintiff.

In a cause of action brought under Section 1605A of the FSIA, the elements for satisfying Iran's liability are "essentially the same" as the elements necessary to establish the waiver of

sovereign immunity discussed above. *See Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 155 (D.D.C. 2010). Simply put, so long as all plaintiffs are United States nationals, then "liability under § 1605A(c) will exist whenever the jurisdictional requirements of § 1605A(a)(1) are met." *Hekmati v. Islamic Republic of Iran*, Case No. 1:16cv875, 2017 WL 4386900, at *11 (D.D.C. Sept. 29, 2017).

In this matter, Plaintiffs are all citizens of the United States.[2] *See* Exs. 2–14 at ¶ 1. Accordingly, to establish Iran's liability as to Counts I through XIII of the Complaint, Plaintiffs rely upon the same facts, law, and argument presented above in support of their argument that sovereign immunity should be waived and that this Court has subject matter jurisdiction. *See supra* Section IV.A. Having established already established these issues, Plaintiffs submit that Iran is liable on all counts under the cause of action enumerated in 28 U.S.C. § 1605A(c).

Upon a finding of liability under the FSIA, the types of damages available to Plaintiffs "may include economic damages, solatium, pain and suffering, and punitive damages." *See* 28 U.S.C. § 1605A(c). By law, this Court is permitted to "appoint special masters to hear damage claims brought under" the terrorism exception to the FSIA. 28 U.S.C. § 1605A(e)(1). Given the large number of individual plaintiffs in this matter, Plaintiffs recommend that this Court appoint a special master for the purpose of hearing the evidence as to damages and recommending appropriate awards.

---

[2] Noree Kamkongkaeo, a family member of one of the Camp Sullivan Victims, was initially a plaintiff in this case and is not an American citizen. Although non-citizen family members of victims can recover, they must plead state law claims such as Intentional Infliction of Emotional Distress, as opposed to the federal cause of action afforded by Section 1605A(c). Plaintiffs made no state law claims in this case and substantively amending this suit would delay all plaintiffs in obtaining judgment. Accordingly, Plaintiffs voluntarily dismissed Ms. Kamkongkaeo from this suit. ECF No. 15. Since that time, counsel for Plaintiffs filed a separate action on behalf of Ms. Kamkongkaeo, as well as another family member of the Camp Sullivan Victims.

If the Court is so inclined, Plaintiffs are prepared to submit recommendations to the Court of qualified special masters with experience hearing similar claims. Should the Court prefer to hear damages evidence directly, however, Plaintiffs are prepared to proceed accordingly.

## VI. CONCLUSION

Iran purposefully trained, supplied, and funded the Taliban for years, with the express purpose of causing American casualties. Such brazen acts exemplify the reasons the State Department designated Iran as a state sponsor of terrorism and why Congress enacted the terrorism exception to sovereign immunity. Plaintiffs seek justice from this Court through a finding of liability against Iran.

WHEREFORE, Plaintiffs pray that the Court issue an Order GRANTING their Motion for Default Judgment against Iran as to liability and directing Plaintiffs on how to proceed with the presentation of evidence as to damages.

Dated: July 13, 2020                                Respectfully submitted,

                                                            /s/ Kevin A. Hoffman
Kevin A. Hoffman (DC Bar No. 1044559)
Randy D. Singer (DCD Bar No. VA0157)
SINGER DAVIS, LLC
1209A Laskin Road
Virginia Beach, VA 23451
Phone: (757) 301-9995
Fax: (757) 233-1084
Email: kevin.hoffman@singerdavis.law
Email: randy.singer@singerdavis.law
*Counsel for Plaintiffs*